# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| TAMMY A. PINGLE, | ) | CASE NO.  3:18CV1933 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Tammy A. Pingle, ("Plaintiff" or "Pingle"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD") and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

# I.   PROCEDURAL HISTORY

In August 2015, Pingle filed an application for POD and DIB alleging a disability onset date of April 28, 2015 and claiming she was disabled due to manic depression, agoraphobia, somatic disorder, anxiety, panic attacks, neck arthritis, right shoulder impingement, bilateral carpal tunnel syndrome, a herniated disc at L4-L5, and a torn left rotator cuff.  (Transcript ("Tr.") 201, 233.)  The applications were denied initially and upon reconsideration, and Pingle requested a hearing before an administrative law judge ("ALJ").  (Tr. 121, 131, 138.)

On August 10, 2017, an ALJ held a hearing, during which Pingle, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 36.)  On December 27, 2017, the ALJ issued a written decision finding Pingle was not disabled.  (Tr. 14-35.)  The ALJ's decision became final on June 23, 2018, when the Appeals Council declined further review.  (Tr. 1.)

On August 22, 2018, Pingle filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 15-1.)  Pingle asserts the following assignments of error:

(1)   The ALJ failed to provide good reasons for discrediting the opinions of both treating doctors, Dr. Houston and Dr. LaTurner.

(2)   The ALJ's residual functional capacity is not supported by substantial evidence because the ALJ failed to address key limitations that could have drastically altered the outcome of the case.

(Doc. No. 15-1.)

# II.   EVIDENCE

## A.   Personal and Vocational Evidence

Pingle was born in January 1964 and was 53 years-old at the time of her administrative hearing, making her a "person closely approaching advanced age" under social security

regulations.  (Tr. 30.)  *See* 20 C.F.R. §§ 404.1563.  She has a high school education and is able to

communicate in English.  (*Id.*)  She has past relevant work as a cook, inspector, auto assembler,

front desk clerk, and fast food worker.  (*Id.*)

**B.      Medical Evidence[2]**

**1.      Mental Impairments**

On June 10, 2014, Pingle underwent a psychological evaluation with psychologist Aaron

LaTurner, Ph.D., in connection with her Workers' Compensation claim.  (Tr. 384.)  Pingle

indicated she was working 40-48 hours a week at a halfway house.  (Tr. 385.)  She reported

performing this job with several physical restrictions, including lifting no more than 10 pounds

on an occasional basis, no more than four hours of standing/walking at a time, and the option to

stand up and move around at will.  (*Id.*)  Pingle reported being on Xanax since the 1990s and

described multiple instances where she had to stop working due to depression, stress, and

anxiety.  (Tr. 386.)  She described her current treatment as a Brintellix and Xanax, which she

obtained through her primary care physician.  (*Id.*)  Pingle indicated she performed daily chores,

but did not cook or socialize.  (Tr. 388.)  She reported driving, but avoiding shopping or being

near others.  (*Id.*)

On examination, Pingle's mood was downcast and anxious, but her thought process was

coherent and goal-oriented.  (*Id.*)  She reported mood fluctuations and panic symptoms 1-2 times

a week.  (Tr. 388, 389.)  Dr. LaTurner administered the Minnesota Multiphasic Personality

Inventory ("MMPI-2"), but the results were deemed invalid because Pingle "endorsed a wide

---

2       The Court's recitation of the medical evidence is not intended to be exhaustive
        and is limited to the evidence cited in the parties' briefs.

3

variety of symptoms and attitudes that may stem from indiscriminately claiming extreme psychological problems, a low reading level, 'a plea for help,' and/or severe psychological deterioration." (Tr. 389.)  Pingle's Beck Depression Inventory yielded a score of 35, indicating a severe level of depressive symptoms.  (*Id*.)  She obtained a score of 34 on her Beck Anxiety Inventory, indicating a moderate level of anxiety.  (*Id*.)

Based upon this assessment, Dr. LaTurner diagnosed somatic symptom disorder, major depressive disorder, and unspecified anxiety disorder.  (Tr. 390.)  He concluded Pingle would likely benefit from cognitive behavioral therapy in conjunction with her medication management. (*Id*.)

In January 2015, Pingle began to see Dr. LaTurner on a regular basis for counseling.  On January 20, 2015, Pingle reported recently losing her job at the group home and indicated she had obtained a job with a temporary service.  (Tr. 378.)  She voiced concerns about her ability to perform the physical aspects of her new job.  (*Id*.)  Dr. LaTurner noted Pingle's mood was depressed.  (*Id*.)

On February 11, 2015, Pingle's mood was downcast and discouraged.  (*Id*.)  On March 10, 2015, her mood was fair and Pingle indicated she was doing better physically.  (*Id*.)  On April 7, 2015, Pingle was frustrated and "down." (Tr. 377.)  She remained concerned about her ability to perform repetitive motions at work.  (*Id*.)  On April 29, 2015, Pingle was tearful during most of her session with Dr. LaTurner.  (Tr. 376.)  She endorsed feelings of worthlessness and frustration.  (*Id*.)  Pingle reported her doctor had taken her off work for two weeks due an increase in depression and anxiety.  (*Id*.)

Pingle returned to Dr. LaTurner on May 20, 2015 with a downcast mood.  (*Id*.)  She

4

admitted she had not taken her medications for the past week because her doctor would not renew her prescription until she saw him.  (*Id*.)  She reported anxiety, depression, and frustration.  (*Id*.)  Dr. LaTurner noted Pingle was to "continue with temporary total disability as she works to stabilize."  (*Id*.)

On June 10, 2015, Dr. LaTurner referred Pingle to Dr. Rhee, a psychiatrist.  (Tr. 375.)  On July 14, 2015, Pingle's mood was downcast.  (*Id*.)  She reported she was unable to work at that time.  (*Id*.)  On August 5, 2015, she was depressed and frustrated.  (Tr. 374.)  Dr. LaTurner and Pingle discussed the interactions of pain, stress, and depression.  (*Id*.)  On September 23, 2015, Pingle visited Dr. LaTurner with a frustrated and downcast mood.  (Tr. 373.)  She indicated she was "very angry and in pain."  (*Id*.)

On October 12, 2015, psychiatrist Young W. Rhee, M.D., completed a "Mental Status Questionnaire" regarding Pingle.  (Tr. 362-366.)  Dr. Rhee noted she had seen Pingle on one occasion, on September 24, 2015.  (Tr. 362.)  During this treatment session, Pingle presented with a normal thought process, but was depressed and irritable.  (*Id*.)  Pingle's memory was intact and her attention, concentration, cognitive ability, and fund of knowledge were all average.  (*Id*.)  Dr. Rhee found Pingle's judgment and insight to be fair.  (*Id*.)  She listed Pingle's diagnoses as major depression, anxiety disorder, cyclothymia, impulse control disorder, and personality disorder.  (Tr. 363.)  She opined Pingle was mildly to moderately impaired in her abilities to (1) remember, understand, and follow directions; (2) maintain attention; and (3) sustain concentration, persist at tasks, and complete tasks in a timely fashion.  (*Id*.)  She observed Pingle was moody, easily angered, "snappy," mean, irritable, easily frustrated, and anxious.  (*Id*.)

Dr. Rhee noted Pingle lived alone, described herself as "not a nice person," and had physical work restrictions since a January 2001 work injury.  (Tr. 365.)  She observed Pingle had no problems in the areas of personal hygiene, food preparation, household chores, and paying bills.  (Tr. 366.)

Pingle returned to Dr. LaTurner on October 21, 2015.  (Tr. 373.)  She reported feeling "significantly more stressed out."  (*Id.*)  Her mood was downcast and frustrated.  (*Id.*)  On November 17, 2015, Pingle's mood was downcast and anxious.  (Tr. 372.)  She was tearful during her treatment session.  (*Id.*)

Pingle underwent a second psychological evaluation with Dr. LaTurner on December 9, 2015.  (Tr. 379.)  This evaluation was done at the request of her attorney "to determine the percent of permanent partial impairment for the BWC psychological claim."  (*Id.*)  Pingle reported performing household chores and infrequent cooking, but admitted she had "been less consistent in activities of daily living and personal hygiene" than she had been in the past.  (Tr. 382.)  She denied socializing.  (*Id.*)  On examination, Pingle's mood was downcast and frustrated.  (*Id.*)  Her eye contact was fair and her thought processes were coherent and goal oriented.  (*Id.*)  She described episodes of depression, during which she would spend two weeks in bed.  (*Id.*)  She endorsed crying spells, anger, low energy, and poor sleep.  (*Id.*)  Dr. LaTurner administered the MMPI-2 and the results were again invalid.  (Tr. 383.)

Based upon this evaluation, Dr. LaTurner provided the following opinion on Pingle:

1.    <u>Activities of Daily Living</u>: Ms. Pingle demonstrates mild to moderate limitations in daily functioning due to her claim allowance.  The degree of impairment in the area of activities of daily living in regards to Ms. Pingle's allowed psychological condition is approximately 15%.

6

2.      Social Functioning: Ms. Pingle's social functioning is moderately
limited.  The degree of impairment in the area of social functioning
in regards to Ms. Pingle's allowed psychological condition is
approximately 25%.

3.      Concentration, Persistence, and Pace: Ms. Pingle's degree of
impairment in the area of Concentration, Persistence and Pace is
mildly to moderately limited and approximately 15%.

4.      Adaptation: Ms. Pingle's ability to adapt to a complex environment
or a work like setting is moderately limited by her allowed
psychological condition.  The degree of impairment in the area of
adaptation is approximately 25%.

The average of the above areas of functioning yields approximately 20%
whole person impairment as a result her allowed condition of aggravation of
pre-existing major depressive disorder.

(*Id.*)

On July 16, 2017, Dr. LaTurner filled out a "Treating Source Statement – Psychological

Conditions" form on behalf of Pingle.  (Tr. 660.)  He listed Pingle's prognosis as "guarded" and

noted he had been provided her with individual counseling for over two years.  (*Id.*)  Dr.

LaTurner found Pingle suffered from the following symptoms:

- anhedonia or pervasive loss of interest in almost all
activities;

- appetite disturbance with change in weight;

- sleep disturbance;

- decreased energy;

- feelings of guilt or worthlessness;

- difficulty concentrating or thinking;

- thoughts of suicide;

- motor tension; and

7

- apprehensive expectation.

(Tr. 661.)  He opined Pingle was not limited in her ability to understand, remember, or apply information, but was moderately limited in her abilities to interact with others, concentrate, persist, and maintain pace, and adapt and manage herself.  (Tr. 662.)  Dr. LaTurner found Pingle had mild limits in her short-term memory, but no limits in her long term memory.  (Tr. 663.)  Dr. LaTurner also found mild limits in Pingle's abilities to remember locations and work-like procedures and understand and carry out detailed.  (*Id.*)  He concluded she had no limits in her ability to understand and carry out short and simple instructions.  (*Id.*)  Dr. LaTurner also opined Pingle:

- could maintain attention and concentration for about two hours;

- could not maintain regular attendance or be punctual within customary tolerances;

- did not require enhanced supervision;

- could sometimes, but not consistently work with the general public, co-workers, and supervisors;

- required praise and positive enforcement from supervisors to handle stress and emotions;

- could sometimes, but not consistently maintain socially appropriate behavior and respond appropriate to changes in the work setting;

- would be off-task 25% of the workday; and

- would be absent from work more than 4 days a month due to her impairments.

(Tr. 663-664.)

8

## 2.      Physical Impairments

Pingle has a long history of various surgeries prior to her alleged onset date, including carpal tunnel releases in 1990, 2001, and 2004; a left rotator cuff repair in 2003, and bilateral foot surgery in 1991. (Tr. 298.) On January 20, 2014, Pingle visited her primary care physician, David Houston, M.D., describing right shoulder pain which radiated into her arm. (Tr. 328.) She reported taking 2.5 tabs of Norco a day for pain relief. (*Id*.) On examination, pain was elicited at her acromioclavicular joint, bicep, and trapezius. (*Id*.) Her range of motion was full and active. (*Id*.) Dr. Houston refilled Pingle's Norco prescription. (*Id.*)

On June 19, 2014, Pingle returned to Dr. Houston for right shoulder pain. (Tr. 322.) She also described anxiety and depression. (*Id*.) On examination, she had pain with range of motion in her shoulder. (*Id*.) On July 14, 2014, Pingle indicated her right shoulder pain was radiating into her neck. (Tr. 320.) On examination, she had no shoulder edema, but pain with palpation in the rotator cuff, decreased strength throughout the arm and shoulder, and a limited active range of motion. (*Id*.) Dr. Houston prescribed Flexeril, Xanax, and referred Pingle to an orthopedist. (*Id*.)

Dr. Houston renewed Pingle's Norco and Xanax prescriptions on April 13, 2015. (Tr. 308.) At that time, Pingle indicated her right shoulder pain was not "too bad" because she was not lifting at work. (*Id*.) She described depression, but denied any suicidal ideation. (*Id*.) On examination, she had 4/5 strength in her shoulder flexors, but full strength in the remainder of her shoulder and a full, active range of motion. (*Id.*) On April 28, 2015, Pingle reported she had been out of her antidepressant, Brintellix, for three weeks. (Tr 306.) Pingle expressed a desire to "fall asleep and not wake up." (*Id.*) She was depressed and tearful on examination. (*Id.*) Dr.

9

Houston renewed Pingle's Brintellix prescription.  (Tr. 307.)

On June 24, 2015, Pingle had an anxious mood and displayed psychomotor agitation. (Tr. 302.)  Dr. Houston renewed Pingle's Brintellix and Norco prescriptions.  (Tr. 303.)  On August 11, 2015, Pingle reported that, in terms of her depression, she was "doing well without any significant affective symptoms."  (Tr. 300.)  She described generalized, radiating shoulder pain and indicated her medications were not working as well as they had previously.  (*Id.*)  Dr. Houston prescribed Lyrica.  (*Id.*)

On May 21, 2016, Pingle presented to the emergency room with a four day history of pain from her left groin into her knee.  (Tr. 482.)  She reported her medications were not providing any relief.  (*Id.*)  On examination, Pingle had a positive straight leg raise on the left side.  (Tr. 483.)  An x-ray of her lumbar spine revealed multi-level degenerative changes and facet arthropathy with no evidence of acute fracture.  (Tr. 484.)  An x-ray of her pelvis revealed degenerative changes with no evidence of acute fracture.  (*Id.*)  The emergency room physicians recommended Pingle follow up with her primary care doctor for treatment.  (*Id.*)

Pingle visited Dr. Houston for her left hip pain on June 17, 2016.  (Tr. 534.)  She indicated her pain was severe "at times" and medications were not helpful.  (*Id.*)  On examination, Pingle appeared to be in pain and she had decreased strength and range of motion in her left hip.  (*Id.*)  Dr. Houston prescribed Lyrica and referred Pingle to an orthopedist.  (Tr. 535.)

On June 22, 2016, Pingle visited physicians' assistant Katie Fultz, PA, at Blanchard Valley Orthopedics.  (Tr. 582.)  She reported left hip and groin pain since April 2016, but denied any numbness or tingling.  (Tr. 584.)  On examination, Pingle had an antalgic gait and a limited

10

range of motion in her left hip.  (Tr. 585.)  Ms. Fultz observed Pingle's x-rays confirmed mild to moderate osteoarthritis.  (*Id.*)  She recommended physical therapy, which Pingle declined.  (*Id.*)

A July 12, 2016 left hip MRI revealed (1) moderate to severe left hip degenerative joint disease; (2) complex degenerative tearing of the anterior labrum; (3) debris and a few loose bodies within the left hip joint; and (4) left hip capsulitis.  (Tr. 575.)

Pingle followed up at Blanchard Valley Orthopedics on July 22, 2016 and saw orthopedist Stanislaw Dajczak, M.D.  (Tr. 591.)  She reported she could "hardly walk" due to hip pain.  (*Id.*)  On examination, Pingle displayed tenderness, a reduced range of motion, decreased strength, and an antalgic gait.  (Tr. 594.)  She had no swelling and a negative straight leg raise. (Tr. 594-595.)  Dr. Dajczak prescribed physical therapy and Diclofenac.  (Tr. 595.)  On August 16, 2016, Pingle underwent a left hip injection, from which she reported 40-45% improvement in symptoms.  (Tr. 608.)

Pingle returned to Dr. Houston on September 8, 2016, for right shoulder pain, severe osteoarthritis of the left hip, and depression.  (Tr. 530.)  Dr. Houston prescribed Cyclobenzaprine,  a muscle relaxant.  (Tr. 531.)  That same date, Pingle saw Dr. Dajczak for left groin and hip pain.  (Tr. 608.)  She indicated she had recently began physical therapy, but still could not lift her leg.  (*Id.*)  On examination, Pingle had decreased range of motion and tenderness in her left hip.  (Tr. 611.)  She had full strength in her right leg, but decreased strength in her left quadriceps.  (*Id.*)  Her sensation was intact and she had negative straight leg raises. (*Id.*)  Dr. Dajczak informed Pingle she was not an "ideal candidate for a total hip arthroplasty" because of her smoking habit and obesity.  (Tr. 612.)  He advised her to continue physical therapy.  (*Id.*)

11

On October 18, 2016, Pingle saw Dr. Houston and reported her depression was "doing well without any significant affective symptoms." (Tr. 525.)  She denied suicidal ideation. (*Id.*)  On examination, she had normal thought processes and perception. (*Id.*)  Her affect and demeanor were appropriate. (*Id.*)  Dr. Houston prescribed Trintellix and Hydrocodone. (Tr. 526.)  On December 27, 2016, Pingle relayed she recently was found to be hypertensive during an emergency room visit. (Tr. 521.)  Dr. Houston prescribed Lisinopril for this issue. (Tr. 522.)

Pingle received a right shoulder cortisone injection from Dr. Houston on January 12, 2017. (Tr. 519.)  On examination, she had no right shoulder edema, but pain was elicited at the bicipital groove of the humerus. (*Id.*)  On February 27, 2017, Pingle was taking her hypertension medication as directed, without any side effects. (Tr. 513.)  She denied any significant symptoms from her depression. (*Id.*)  Pingle relayed she was scheduled for a total hip replacement on March 23, 2017. (*Id.*)

Pingle underwent the left total hip replacement operation as scheduled. (Tr. 656.)  She followed up at her orthopedist's office on May 5, 2017. (*Id.*)  At that time, her hip was doing "doing well" and she was in physical therapy. (*Id.*)  Pingle was able to perform her physical therapy exercises at home and while the first "couple steps are still difficult," her gait improved with increased mobility and less tightness. (*Id.*)  Physicians' assistant Mary Singian, PA-C, observed Pingle "continues to use a cane due to her instability." (*Id.*)  On examination, Pingle had mild tenderness over her incision, 4/5 strength, an antalgic gait, and a negative straight leg raise. (Tr. 657.)  Her joints above and below her hip were within normal limits. (*Id.*)

Ms. Singian recommended Pingle continue her daily exercises and physical therapy, but Pingle declined to continue physical therapy. (Tr. 658.)  Ms. Singian also recommended Pingle

12

use her cane for better stability when ambulating.  (*Id.*)

On July 20, 2017, Dr. Houston filled out a form entitled "Treating Source Statement – Physical Conditions" regarding Pingle.  (Tr. 668.)  Dr. Houston found the following limitations for Pingle:

- She would be off-task for 20% of the workday;

- She would be absent from work more than four days a month;

- She could rarely lift less than 10 pounds and never lift more than 10 pounds;

- She could sit for two hours and stand and walk for one hour in an 8-hour workday;

- She would require the option to sit/stand at will;

- She requires the use of a cane or other assistive device to "ambulate effectively;"

- She requires a cane but can ambulate a quarter of a mile without it;

- She can never reach overhead and rarely reach in all directions, handle, finger, feel, push, and pull;

- She can occasionally use bilateral foot controls and climb stairs and ramps;

- She can never climb ladders or scaffolds or balance, stoop, kneel, crouch, and crawl;

- She can occasionally rotate her head and neck;

- She can occasionally work at unprotected heights, near moving mechanical parts, in humidity and wetness, with dusts, odors, fumes, pulmonary irritants, in extreme cold, and extreme heat; and

- She can never operate a vehicle or work near vibration.

(Tr. 668-671.)

13

**C.      State Agency Reports**

**1.         Mental Impairments**

On November 13, 2015, state agency physician Todd Finnerty, Psy.D., reviewed Pingle's medical records and filled out a Psychiatric Review Technique ("PRT") assessment.  (Tr. 93-94.) Dr. Finnerty concluded Pingle had (1) mild restrictions in activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, and pace; and (4) no episodes of decompensation.  (*Id*.)  Dr. Finnerty also completed a Mental Residual Functional Capacity ("RFC") Assessment.  (Tr. 97-99.)  He concluded Pingle was moderately limited in her abilities to (1) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (2) interact appropriately with the general public; (3) accept instructions and respond appropriately to criticism from supervisors; (4) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (5) respond appropriately to changes in the work setting. (Tr. 98-99.)  Dr. Finnerty found no significant limitations in Pingle's abilities to (1) carry out short, simple, and detailed instructions; (2) maintain attention and concentration for extended periods; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; (4) sustain an ordinary routine without special supervision; (5) work in coordination with or in proximity to others without being distracted by them; (6) make simple work related decisions; (7) ask simple questions or request assistance; (8) be aware of normal hazards and take appropriate precautions; (9) travel in unfamiliar places or use public transportation; and (10) set realistic goals or make plans independently of others.  (*Id*.)  He found

14

no evidence of limitation in Pingle's ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. 99.) Dr. Finnerty explained the basis of his decision as follows

The [claimant] can sustain a static set of tasks without fast pace.

***

[Claimant] should be limited to superficial contact with others.

***

The [claimant] can adapt to a static setting without frequent changes.

(Tr. 98-99.)

On March 5, 2016, state physician Aracelis Rivera, Psy.D., reviewed Pingle's medical records and completed a PRT assessment and Mental RFC assessment. (Tr. 109, 113-115.) Dr. Rivera affirmed the findings of Dr. Finnerty. (*Id.*)

### 2. Physical Impairments

On December 7, 2015, Pingle underwent a consultative examination with Babatunde Onamusi, M.D. (Tr. 391-402.) She reported numbness and tingling in her right hand and fingers, despite undergoing two carpal tunnel releases in that hand. (Tr. 400.) Pingle described constant pain in her shoulders, a remote history of a herniated disc in her lumbar spine, and a "diagnosis of right labral tear that she refused to have surgery on." (*Id.*)

On examination, Pingle had normal muscle power and tone in all muscle groups and intact sensation in all extremities. (Tr. 401.) She had a normal gait and did not require an assistive device for ambulation or transfer. (*Id.*) She was able to squat, kneel, walk in tandem, stand on her heels and toes, and grip and grasp with both hands. (*Id.*) Her grip strength was

15

measured at 40 pounds on both sides.  (Tr. 402.)  She could reach forward, push, and pull with

the upper extremities and could use her hands for fine coordination and manipulative tasks.  (*Id.*)

She had mild anterior shoulder tenderness bilaterally, but negative impingement signs and no

demonstrable rotator cuff weakness.  (*Id.*)  She had a full range of motion in her spine with no

definite tenderness along the spine.  (*Id.*)

> Based upon this examination, Dr. Onamusi provided the following assessment:

> Based on information obtained during this examination it is my opinion that
> claimant is capable of engaging in light physical demand level activities as
> defined in the Dictionary of Occupational Titles.

(Tr. 402.)

On December 31, 2015, state agency physician Gary Hinzman, M.D., reviewed Pingle's

medical records and completed a Physical RFC assessment.  (Tr. 95-97.)  Dr. Hinzman

determined Pingle could lift and carry up to 20 pounds occasionally and 10 pounds frequently;

stand and/or walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour

workday.  (Tr. 95.)  He further found Pingle could occasionally push and pull bilaterally with the

upper extremities, frequently climb ramps and stairs, occasionally climb ladders, ropes, or

scaffolds, frequently balance, kneel, crouch, and crawl, and occasionally stoop.  (Tr. 96.)  Dr.

Hinzman further limited Pingle to occasionally reaching overhead bilaterally, no working at

unprotected heights, and no commercial driving.  (Tr. 96-97.)

On March 9, 2016, state agency physician Elaine M. Lewis, M.D., reviewed Pingle's

medical records and completed a Physical RFC assessment.  (Tr. 111-113.)  She adopted the

findings of Dr. Hinzman.  (*Id.*)

**D.**  **Hearing Testimony**

During the August 10, 2017  hearing, Pingle testified to the following:

- She lives alone in a mobile home.  (Tr. 42-43.)  She graduated high school.  (Tr. 45.)  She has been on Medicaid for two years.  (*Id*.)

- She works 16-18 hours a week as a companion.  (Tr. 44.)  She drives and has a handicap placard for her vehicle.  (*Id*.)  She drives three days a week when she is with her client.  (*Id*.)  Her client is a mentally delayed 25 year old woman.  (Tr. 46.)  They go fishing and watch movies.  (*Id*.)

- Prior to being a companion, she worked in a factory and at a halfway house.  (Tr. 47.)  She also has worked as a cook and a cashier.  (Tr. 48.)

- She could not mentally handle working more than 16-18 hours as a companion.  (Tr. 51.)  She left her factory job in 2015 because her back, legs, and shoulders hurt.  (*Id*.)

- She cannot work full time because her depression has worsened.  (Tr. 52.)  She recently had her hip replaced and she is still in pain.  (Tr. 53.)  She attends physical therapy twice a week, which is difficult because she has a torn meniscus in her knee.  (*Id*.)  She attempted water therapy but it did not alleviate her hip pain.  (Tr. 54.)

- She uses a cane when she is "out and about," but did not bring it to the hearing.  (Tr. 55.)  She uses it because her legs are "very weak."  (*Id*.)  She takes Oxycodone and Acetaminophen for her pain.  (*Id*.)  She can stand 15-20 minutes without her cane.  (Tr. 69.)

- She takes an antidepressant and attends counseling with Dr. LaTurner once a month.  (Tr. 56.)  She has 5-6 days a month where her depression is so bad she does not leave her bed.  (Tr. 58.)  She has to reschedule work during these episodes and had to reschedule four times in July.  (*Id*.)  She has a tendency to get angry and into arguments with others.  (Tr. 71-72.)

- She does her household chores, but sweeping is painful.  (Tr. 59.)  She goes grocery shopping twice a month.  (Tr. 65.)  She uses a grocery cart to balance herself.  (Tr. 68.)

- She has a lateral tear in her right shoulder.  (Tr. 59.)  She can reach out in front of her, but not overhead.  (Tr. 60.)  She also has carpal tunnel.  (Tr. 62.)  She had carpal tunnel surgery in 2002 but her hands continue to swell and tingle.  (Tr. 63.)  She cannot use her hands for long periods.  (*Id*.)

17

The VE testified Pingle had past work as a fast food worker, inspector, cook, front desk clerk, and automotive assembler.  (Tr. 76.)  The ALJ then posed the following hypothetical question:

> Assume an individual of the claimant's age, education and experience, has the residual functional capacity for light work.  Can occasionally push and pull bilaterally, occasionally climb ramps and stairs, never climb ladders, ropes, and scaffolds, occasionally balance, stoop, kneel, crouch and crawl, frequently reach.  Avoid all exposure to unprotected heights and no commercial driving.  Understand, remember and carry out simple instructions, perform simple, routine and repetitive tasks, but not at a production rate pace such as an assembly line.  Adapt to routine changes in the workplace that are infrequent and easily explained.  Interact occasionally with supervisors, coworkers and the general public.

(Tr. 77.)

The VE testified the hypothetical individual would not be able to perform Pingle's past work.  (*Id.*)  The VE also sought clarification of the pushing/pulling restrictions as follows:

> VE:     A question for you, Your Honor.  The pushing/pulling is essentially part of the definition of light.  The weight lifted is also the same as the pushing and pulling and essentially is my understanding of pushing and pulling.  The reaching would be affected as pushing and pulling or moving objects or the same amount of weight away from the body.  Essentially, the way I understand pushing and pulling is it limits the reaching to occasional as well.
>
> ALJ:    I see. Well, I think I misspoke then.  Let's say occasionally operates hand controls.  That's really what I'm talking about, okay?

(Tr. 78.)

After this clarification, the VE testified the hypothetical individual would be able to perform other representative jobs in the economy, such as inserter (D.O.T. #794.687-058); ticketing in a textile position (D.O.T. #229.587-018); and labeler (D.O.T. #920.587-014).  (*Id.*)

18

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the

claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Pingle was insured on her alleged disability onset date, April 28, 2015, and remains insured through September 30, 2021, her date last insured ("DLI.")  (Tr. 19.)  Therefore, in order to be entitled to POD and DIB, Pingle must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through September 30, 2021.

2.  The claimant has not engaged in substantial gainful activity since April 28, 2015, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.  The claimant has the following severe impairments: obesity; osteoarthritis of shoulder with labral tear; degenerative disc disease at lumbar level 4-5; osteoarthritis, left hip, status post replacement; major depressive disorder; and generalized anxiety disorder (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR

20

404.1567(b) except: can occasionally operate foot controls; occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds; occasionally balance, kneel, crouch, stoop and crawl; frequently reach.  Must avoid all exposure to unprotected heights and no commercial driving; Understand, remember, and carry out simple instructions; Perform simple, routine, and repetitive tasks but not at a production rate pace such as an assembly line; adapt to routine changes in the workplace that are infrequent and easily explained; interact occasionally with supervisors, coworkers, and the general public.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on January **, 1964 and was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from April 28, 2015, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 19-31.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to

proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been

defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v.

Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and

Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are

supported by substantial evidence, the Court does not review the evidence *de novo*, make

credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*,

889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston

v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are

not subject to reversal, however, merely because there exists in the record substantial evidence to

support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing

*Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203

F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion,

the decision of the Administrative Law Judge must stand if the evidence could reasonably

support the conclusion reached.")  This is so because there is a "zone of choice" within which the

Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing

*Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by

substantial evidence, the Court must determine whether proper legal standards were applied.

Failure of the Commissioner to apply the correct legal standards as promulgated by the

22

regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

## A.        First Assignment of Error: Treating Source Opinions

In her first assignment of error, Pingle argues the ALJ failed to provide good reasons for discrediting the opinions of her treating sources, Drs. Houston and LaTurner.  (Doc. No. 15-1 at 2.)  She asserts the ALJ incorrectly equated Dr. LaTurner's moderate findings to the Social Security Administration's definition of moderate "paragraph B" criteria.  (*Id*. at 8-9.)  With respect to Dr. LaTurner's July 2017 opinion, Pingle argues the reasons the ALJ provided are speculative and "factually incorrect."  (*Id*. at 11.)  Pingle maintains "the evidence of record is

overwhelming in favor of Dr. LaTurner's treating source opinions." (*Id.* at 13.) As to Dr.

Houston's opinion, Pingle contends the ALJ, rather than relying on "the medical evidence and

clinical evidence of record," pointed to "different activities of daily living that [he] considers to

be inconsistent with Dr. Houston's opinions concerning Ms. Pingle's ability to perform various

work activities." (*Id.* at 14.) She maintains the "ALJ failed to explain why these activities are

necessary and therefore contradictory to Dr. Houston's opinion." (*Id.* at 15.)

The Commissioner maintains the ALJ properly considered the opinions of Drs. Houston

and LaTurner. (Doc. No. 14 at 7.) With respect to Dr. LaTurner's opinions, the Commissioner

asserts "there is no indication that the ALJ assumed that Dr. LaTurner used the word 'moderate'

in the same way that the Agency uses the word 'moderate' when evaluating the 'B' criteria" of

the Listings. (*Id.* at 9.) The Commissioner argues the ALJ provided good reasons for giving

limited weight to Dr. LaTurner's conclusions regarding off-task behavior and absenteeism. (*Id.*

at 10.) With respect to Dr. Houston's opinion, the Commissioner insists the ALJ appropriately

considered Pingle's ability to live on her own and the inconsistency between her successful

recovery from hip surgery and the "extent of Dr. Houston's opined limitations." (*Id.* at 12, 13.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is

well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is

not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of

Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[3]  However, "a finding

that a treating source medical opinion . . . is inconsistent with the other substantial evidence in

---

[3]   Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

24

the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[4] *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy

---

[4]     Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley,* 581 F.3d at 406. Moreover, the "treating physician rule" only applies to *medical opinions*. "If the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors— [the ALJ] decision need only 'explain the consideration given to the treating source's opinion.'" *Johnson v. Comm'r of Soc. Sec.*, 535 Fed. App'x 498, 505 (6th Cir. 2013). The opinion, however, "is not entitled to any particular weight." *Turner*, 381 Fed. App'x at 493. *See also Curler v. Comm'r of Soc. Sec.,* 561 Fed. App'x 464, 471 (6th Cir. 2014).

### *Dr. Houston*

The ALJ weighed the opinion evidence from Dr. Houston as follows:

Dr. Houston provided a medical source statement in July 2017, noting the claimant's various conditions included osteoarthritis of the hip, classic migraine, carpal tunnel syndrome, anxiety depression panic disorder, degenerative disc disease, osteoarthritis of shoulder, bicipital tendonitis, tear labrum of shoulder, hypertension and hyperlipidemia, with symptoms present since 2013. The claimant was noted as being able to rarely lift or

carry up to ten pounds, sit for two hours, stand or walk for one hour each and need to sit or stand at will in the workplace.  Use of a cane to ambulate effectively was noted, although it was also stated that the claimant could walk up to 1/4 mile without a cane.  Rare reaching and handling, along with occasional use of foot controls was indicated, with never reaching overhead.  The claimant was also described as never being able to engage in postural movement, aside from occasional rotation of her head and neck.  The claimant was also noted as precluded from operation of a motor vehicle, and not to be exposed to vibration.  Occasional use of foot controls was permitted.  Dr. Houston also indicated that the claimant was expected to be off task for 20 percent of the workday and miss four days of work each month.  (Exhibit 17F).  Only partial weight is accorded to this opinion, which is inconsistent with the record as a whole.  For example, while Dr. Houston states the claimant can never drive, the claimant has testified she drives several times each week for her job.  As a person living alone, it is inconceivable that she is unable to engage in any postural movements, as she obviously needs to perform basic household chores, such as cooking and light cleaning, as well as dressing and bathing.  This statement was provided post hip surgery.  The claimant's surgeon appeared to think the claimant had recovered well from the procedure, which makes the standing and walking limitations inconsistent with the record as well.  Treating source opinions are to be given controlling weight if well supported by medically acceptable clinical or laboratory diagnostic techniques and not inconsistent with the other substantial evidence (20 CFR 404.1527(d)).  In this instance, the extremely limited abilities noted by Dr. Houston are inconsistent with the record overall.

(Tr. 25-26.)

The Court finds the ALJ did not err in assigning less than controlling weight to Dr. Houston's opinion.  In assigning "partial weight" to Dr. Houston's conclusions, the ALJ addressed the consistency of the opinion with the record, noting the opinions conflicted with Pingle's own testimony and the treatment notes.  (Tr. 26.)  The ALJ provided examples of this inconsistency, noting that while Dr. Houston found Pingle could not drive, Pingle drove several times a week in connection with her job.  (*Id*.)  The ALJ also observed Pingle lived alone, which cast doubt on Dr. Houston's conclusions Pingle was completely precluded from performing postural movements.  (*Id*.)  Finally, the ALJ acknowledged Pingle had "recovered well" from her

27

hip surgery, which was at odds with Dr. Houston's extreme walking and standing limits.  (*Id.*)

Pingle asserts the ALJ did not "rely on the medical and clinical evidence of record," instead discrediting Dr. Houston's opinion on the basis of "different activities of daily living." (Doc. No. 15-1 at 14.)  As an initial matter, an ALJ may consider a claimant's daily activities, as well as a claimant's testimony regarding her abilities, in discounting the opinions of a treating source.  *Maloney v. Comm'r of Soc. Sec.,* 480 F. App'x 804, 809 (6th Cir. 2012) (An ALJ permissibly discounted opinions of treating source which conflicted with the claimant's own testimony regarding her abilities).  *See also Revolt v. Comm'r of Soc. Sec.*, 2018 WL 5013839, *12 (N.D. Ohio Oct. 16, 2018); *Davis v. Comm'r of Soc. Sec.*, 2014 WL 4182737, *8-9 (N.D. Ohio Aug. 21, 2014)(finding the consideration of a claimant's daily activities permissible when discrediting a treating source opinion).

Moreover, the ALJ did not solely rely on Pingle's daily activities when discrediting Dr. Houston's conclusions.  Indeed, the ALJ asserted this opinion was "inconsistent with the record as a whole" and specifically discussed Pingle's post-surgical treatment notes.  (Tr. 26.)  Prior to discussing Dr. Houston's opinion, the ALJ reviewed, at length, Pingle's December 2015 consultative examination and her orthopedist's treatment notes.  (Tr. 24-25.)  The ALJ discussed how Pingle had a normal range of motion in the spine, hips, knees and ankles and an "ability to use her hands for fine coordination and manipulative tasks" during her consultative examination. (Tr. 24.)  The ALJ further observed Pingle could "tandem walk, stand on heels and toes, squat and kneel."  (*Id*.)  The ALJ acknowledged Pingle began to report hip pain in May 2016 and eventually underwent hip surgery in March 2017.  (Tr. 24-25.)  However, the ALJ noted the surgery "went well" and Pingle was "doing good" following the procedure.  (Tr. 25.)

28

Considering the ALJ provided this detailed discussion of the evidence in the decision, it is disingenuous of Pingle to suggest the ALJ did not  "rely on the medical and clinical evidence of record" when discrediting Dr. Houston's decision.  (Doc. No. 15-1 at 14.)

Pingle also argues the ALJ's discussion of Dr. Houston's driving restrictions is "confusing" and "should be disregarded."  (Doc. No. 15-1 at 14.)  Pingle contends that because "Dr. Houston [was] referring to Ms. Pingle's ability to operate a vehicle on the job," Pingle's ability to drive on her personal time is not inconsistent with this limitation.[5]  (*Id.*)  However, Pingle's own testimony supports the ALJ's conclusion.  Indeed, Pingle testified she drives "three days a week when I have my client."  (Tr. 44.)  She further explained she "drives [her client] to her doctor's visits or where she needs to go," thus directly showing Pingle is able to operate a motor vehicle in connection with her job.  (Tr. 46.)  Therefore, the ALJ correctly concluded Dr. Houston's motor vehicle restriction was inconsistent with the record.  (Tr. 26.)

Pingle also takes issue with the ALJ's conclusion that because Pingle lives alone, it is "inconceivable that she is unable to engage in any postural movements."  (Tr. 26, Doc. No. 15-1 at 14-15.)  Pingle's testimony again supports the ALJ's reasoning.  Pingle testified she does her own household chores.  (Tr. 59.)  She showers, washes her hair, uses a computer, and dresses herself, all activities which involve postural movements.  (Tr. 60.)  Moreover, the evidence of record supports the ALJ's conclusion.  Indeed, during the December 2015 consultative examination, Pingle had normal muscle power and tone in all muscle groups and intact sensation in all extremities.  (Tr. 401.)  She had a normal gait and did not require an assistive device for

---

[5]  As noted *supra,* Dr. Houston opined Pingle could never operate a vehicle.  (Tr. 671.)

ambulation or transfer.  (*Id.*)  She was able to squat, kneel, walk in tandem, stand on her heels and toes, and grip and grasp with both hands.  (*Id.*)  The ALJ discussed these findings in the decision.  (Tr. 24.)

Pingle further argues the ALJ's "unsupported theory" Pingle had recovered from her hip surgery "is in conflict with Dr. Houston's own report indicat[ing] that the symptoms and limitations first appeared in 2013."  (Doc. No. 15-1 at 15.)  However, while Dr. Houston indicated Pingle's limitations were in existence since 2013, the medical evidence of record suggests otherwise.  (Tr. 668.)  Pingle did not begin to report any left hip or groin pain until May 2016.  (Tr. 482.)  At that time, she presented to the emergency room, reporting her pain "started about 4 days ago."  (*Id.*)  In June 2016, Pingle again confirmed to Dr. Houston her left hip pain had not been diagnosed until "2 months ago."  (Tr. 534.)  As accurately noted by the ALJ, within a year of beginning to experience hip pain, Pingle had undergone surgery and was doing well post operatively.  (Tr. 24, 26, 513, 656.)

Moreover, substantial evidence supports the ALJ's finding Dr. Houston's opinions were entitled to partial weight.  Pingle has a long history of right shoulder pain, for which she takes pain medications.  (Tr. 328, 510, 519.)  However, Dr. Houston often noted a full, active range of motion in her shoulder and only slightly decreased strength.  (Tr. 308, 328.)  During her consultative examination, Pingle had normal muscle power and tone in all muscle groups and intact sensation in all extremities.  (Tr. 401.)  She was able to grip and grasp with both hands, and could reach forward, push, and pull with the upper extremities.  (*Id.*)  She was able to use her hands for fine coordination and manipulative tasks.  (*Id.*)  She had mild anterior shoulder tenderness bilaterally, but with negative impingement signs and no rotator cuff weakness.  (*Id.*)

30

These objective findings are inconsistent with Dr. Houston's conclusions Pingle could rarely lift 10 pounds or perform any manipulative activity. (Tr. 669-670.)

In May 2016, a year after her alleged onset date, Pingle began to report left hip and groin pain. (Tr. 482.) She had a limited range of motion in her left hip and 4/5 motor strength in the left leg. (Tr. 534.) Pingle consulted with an orthopedist and an MRI confirmed moderate to severe degenerative changes in her left hip as well as a degenerative tear of the labrum. (Tr. 585, 575.) She was observed to have an antalgic gait, but negative straight leg raises and full strength in her right leg. (Tr. 594, 595, 611.) Pingle attempted injections and physical therapy, but she ultimately underwent a left total hip arthroplasty in March 2017. (Tr. 608, 513.) By May 2017, Pingle was recovering nicely from her surgery, reporting she was "doing well" and her "hip is good." (Tr. 656.) She continued to have an antalgic gait, but only mild tenderness and 4/5 strength. (Tr. 657.) Her joints above and below her hip were within normal limits. (*Id*.) Moreover, prior to her operation, during her consultative examination, Pingle had a normal gait and did not require an assistive device for ambulation or transfer. (Tr. 401.) She was able to squat, kneel, walk in tandem, and stand on her heels and toes. (*Id*.) These pre and post surgical treatment notes support the ALJ's conclusion Dr. Houston's standing and walking limits were "inconsistent with the record." (Tr. 26.) In addition, the ALJ adopted Dr. Houston's conclusion Pingle would have a limited ability to operate foot controls, which is consistent with her decreased leg strength and surgical history. (Tr. 22.)

Accordingly, the Court finds the ALJ met the burden of offering good reasons to support his decision to assign less than controlling weight to Dr. Houston's opinions. This portion of Pingle's first assignment of error, therefore, is without merit and does not provide a

31

basis for remand.

### *Dr. LaTurner – December 2015*

The ALJ weighed the December 2015 opinion from Dr. LaTurner as follows:

Dr. LaTurner provided a psychological evaluation in December 2015, which appears to be related to the claimant's Workers' Compensation claim with an initial date of injury of January 12, 2001.  The claimant indicated that her most recent job was doing factory work, which ended when she had a "meltdown" and was taken off work as a result.  Repetitive use injury was noted.  The claimant reported that she tried to keep up with daily chores and frequently stayed at home.  She reported shopping once or twice each month.  The claimant presented as downcast, maintaining fair eye contact.  The claimant was coherent and had a goal oriented thought process.  She reported poor energy and depression, stating she had recently spent "like two weeks in bed."  She also reported having crying spells during the week as well as "a lot of anger."  One of the psychological tests performed at this assessment resulted in an "invalid profile," with note that "a wide variety of symptoms and attitudes" endorsed could stem from "indiscriminately claiming extreme psychological problems."  The claimant was found to have mild to moderate limitation regarding activities of daily living; and a moderate degree of limitation regarding social function, the ability to concentrate, persist and maintain pace, and regarding adaption.  (Exhibit 3F and 10F).  The finding of a moderate degree of limitation due to mental health related symptoms is consistent with the record overall, therefore great weight is accorded to this assessment.  It is noted that Dr. LaTurner did not indicate in this assessment that the claimant was precluded from all work related activities.

(Tr. 27-28.)

The Court finds the ALJ did not err in his treatment of Dr. LaTurner's opinion because the RFC adopted (or was not inconsistent with) the findings made by Dr. LaTurner in his December 2015 opinion.  Indeed, in December 2015, Pingle underwent a psychological evaluation with Dr. LaTurner in connection with her Workers' Compensation claim.  (Tr. 379.) Based upon this evaluation, Dr. LaTurner found Pingle had (1) mild to moderate limitations in daily functioning; (2) moderate social functioning limitations; (3) mild to moderate

32

concentration, persistence, and pace limitations; and (4) moderate adaption limitations.  (Tr.

383.)  The ALJ afforded this conclusion "great" weight and provided for several mental

limitations in the RFC: 1) an ability to understand, remember, and carry out simple instructions;

2) a limit to simple, routine, and repetitive tasks, but not at a production rate pace such as

assembly line work; 3) an ability to adapt to routine, infrequent, and easily explained workplace

changes; and 4) occasional interaction with supervisors, coworkers, and the general public.  (Tr.

22.)

These RFC restrictions appropriately accounted for Dr. LaTurner's mild to moderate

limitations.  For example, Dr. LaTurner found moderate social limitations and the ALJ limited

Pingle to occasional interaction with others.  (Tr. 383, 22.)  Dr. LaTurner also found mild to

moderate concentration deficits, and the ALJ limited Pingle to simple tasks and instructions.

(*Id.*)  Finally, Dr. LaTurner concluded Pingle had moderate adaption limitations and the ALJ

accordingly found Pingle could only adapt to routine, infrequent, and easily explained changes.

(*Id.*)  As the RFC does not conflict with Dr. LaTurner's opinion, the ALJ did not need to explain

or provide good reasons as to why it was not adopted.  *See* Social Security Ruling 96-8p, 1996

WL 374184, at *7 (July 2, 1996) ("[t]he RFC assessment must always consider and address

medical source opinions.  If the RFC assessment *conflicts* with an opinion from a medical

source, the adjudicator must explain why the opinion was not adopted.")(emphasis added).

Pingle argues Dr. LaTurner and the ALJ may not have interpreted moderate in the same

way.  (Doc. No. 15-1 at 9, 10.)  However, in his opinion, Dr. LaTurner did not define moderate

or provide any specific limitations for Pingle.  Pingle does not describe what exact limitations

the ALJ should have incorporated into the RFC to better reflect Dr. LaTurner's conclusions.  She

also does not explain how the assessed RFC restrictions were inconsistent with Dr. LaTurner's findings.  It is unclear how Pingle wanted the ALJ to incorporate Dr. LaTurner's vague conclusions she was "mild to moderately" impaired in several areas, beyond what is already present in the RFC.

Pingle also suggests the ALJ equated the moderate findings in Dr. LaTurner's opinion with moderate "B Criteria" under step three of the decision.  (Doc. No. 15-1 at 9.)  This is assertion has no basis.  The ALJ does not, at any point in the decision, reach this conclusion or suggest his "B criteria" findings correspond with Dr. LaTurner's opinion.  (*See* Tr. 21, 27-28.)

Finally, Pingle contends the ALJ improperly observed Dr. LaTurner did not preclude Pingle "from all work related activities."  (Tr. 28.)  Pingle argues because Dr. LaTurner is not "allowed to comment on this issue," the ALJ's "requirement that Dr. LaTurner needed to find [she] was unable to work" is inconsistent with social security regulations.  (Doc. No. 15-1 at 10.)  It is true the Commissioner (and not a treating physician) must make the final decision on the ultimate issue of disability.  *See Duncan v. Sec'y of Health and Human Serv.*, 801 F.2d 847, 855 (6th Cir. 1986); *Harris*, 756 F.2d at 435.  *See also* 20 C.F.R. § 404.1527(d)(1)[6] ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.")  However, the ALJ was not "requiring" Dr. LaTurner conclude Pingle was unable to work.  As noted *supra*, Dr. LaTurner's opinion was rendered at the request of Pingle's attorney "to determine the percent of permanent partial impairment for the BWC psychological claim."  (Tr. 379.)  Dr. LaTurner accordingly found specific percentages

---

[6]     Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

34

of disability due to Pingle's mental impairments.  (Tr. 383.)  The ALJ's observation Dr. LaTurner did not completely preclude Pingle from work was a relevant consideration in evaluating the medical evidence of record.

Accordingly, the Court finds the ALJ properly considered Dr. LaTurner's December 2015 assessment.  This portion of Pingle's first assignment of error, therefore, is without merit and does not provide a basis for remand.

***Dr. LaTurner – July 2017***

The ALJ weighed the July 2017 opinion from Dr. LaTurner as follows:

In July 2017, Dr. LaTurner provided a treating source statement noting major depressive disorder as an allowed Workers' Compensation claim. The claimant was found to have no limitation regarding the ability to understand, remember or apply information.  Moderate limitation regarding social interaction as well as adaptation and self-management were noted, with the claimant described as easily overwhelmed and angered as well as frustrated with others.  Moderate limitation regarding concentration, persistence, and pace was indicated as due to pain.  Mild limitation regarding short-term memory, with no limitation regarding long-term member was also indicated.  The claimant was found unable to maintain regular attendance or punctuality, although did not require enhanced supervision in the workplace.  The ability to sustain concentration was limited to two hours.  The claimant was found to be unable to consistently work with the public, co-workers or supervisors, and requiring positive reinforcement from supervisors.  The claimant was found unable to consistently respond to change in a work setting and to maintain socially appropriate behavior.  Dr. LaTurner concluded that the claimant would be off task for 25 percent of the work day as well as miss four days of work each month. (Exhibit 16F).  While great weight is accorded to the findings of a moderate degree of limitation due to mental health impairments, limited weight is accorded to the conclusion of the amount of time the claimant would be off task or miss from work.  The claimant has managed to be successful with her current part time employment.  There is no indication that she would be unable to do this sort of work, or other work with appropriate accommodations on a full time basis.  Treating source opinions are to be given controlling weight if well supported by medically acceptable clinical or laboratory diagnostic techniques and not inconsistent with the other substantial evidence. (20 CFR 404.1527(d)).  Treatment

> notes provided by Dr. LaTurner do not support the assessment of the
> amount of time the claimant would likely be off task during the workday.
> The claimant appears to be punctual for appointments.  She is consistently
> noted as not having "significant" mental health related symptoms by Dr.
> Houston who appears to have seen the claimant on a more frequent basis
> than Dr. LaTurner has.  However, appropriate accommodations regarding
> potential limitations in concentration and social interaction have been
> included in the residual functional capacity assessment.

(Tr. 28-29.)

As an initial matter, the Court notes the RFC adopted (or was not inconsistent with) the majority of the functional limitations assessed by Dr. LaTurner in his July 2017 opinion. Specifically, the ALJ found Pingle was limited to understanding, remembering, and carrying out simple instructions; simple, routine, and repetitive tasks, but not at a production rate pace such as an assembly line; an ability to adapt to routine changes in the workplace which were infrequent and easily explained; and occasional interaction with supervisors, coworkers, and the general public.  (Tr. 22.)  Similarly, Dr. LaTurner found no limits in Pingle's ability to understand and apply information, and moderate limits in her abilities to interact with others, concentrate, and adapt.  (Tr. 662.)  The doctor also found only mild limitations in short term memory and no long term member limits, or any limits in Pingle's ability to understand and carry out short and simple instructions.  (Tr. 663.)  Because these limitations provided by Dr. LaTurner are consistent[7] with

---

[7]    As discussed above, Pingle has attempted to argue the moderate and mild limitations assessed by Dr. LaTurner are inconsistent with the RFC.  (Doc. No. 15-1 at 9, 10.)  However, similar to Dr. LaTurner's December 2015 opinion, Pingle has not explained how the assessed RFC restrictions were inconsistent with Dr. LaTurner's July 2017 findings.  Indeed, in his July 2017 opinion, Dr. LaTurner found mild to moderate limits in most areas, and the ALJ accordingly found several mental RFC restrictions to account for this.  (Tr. 662-664, 22.)  These RFC restrictions appropriately accounted for Pingle's mild to moderate limitations and are therefore consistent with Dr. LaTurner's conclusions.

the RFC findings made by the ALJ, they need not be addressed in evaluating the ALJ's weighing of Dr. LaTurner's July 2017 opinion.

The RFC does conflict, however, with a few specific portions of Dr. LaTurner's July 2017 opinion. Namely, Dr. LaTurner opined Pingle would be off task for 25% of the workday and would miss more than four days of work per month. (Tr. 664.) For the following reasons, the Court finds the ALJ properly evaluated this portion of Dr. LaTurner's opinion. The ALJ correctly noted Dr. LaTurner was a treating source. (Tr. 28.) He declined to assign this opinion controlling weight, explaining he afforded "limited weight" to "the conclusion of the amount of time [Pingle] would be off task or miss from work." (*Id.*) The ALJ observed these limitations were inconsistent with Pingle's ability to work part-time, Dr. LaTurner's own treatment notes, and Dr. Houston's treatment notes. (Tr. 28-29.) The ALJ then noted specifically where Dr. LaTurner's conclusions were inconsistent with the treatment notes. (*Id.*) For example, the ALJ observed Dr. Houston repeatedly noted Pingle did not have any significant mental health related symptoms. (Tr. 29.) The ALJ also provided a detailed overview of Dr. LaTurner's treatment notes earlier in the decision, which revealed Pingle's mood and overall stability were improved with medications. (Tr. 26-27.) In addition, the ALJ observed Pingle was "doing well without any significant affective symptoms" in May 2017. (Tr. 25.)

Moreover, substantial evidence supports the ALJ's finding Dr. LaTurner's conclusions regarding absenteeism and off-task behavior are entitled to limited weight. Dr. Houston, Pingle's primary care doctor, prescribed Pingle anti-anxiety and antidepressant medications throughout the relevant period. (Tr. 321, 307, 303, 526.) In April 2015, Dr. Houston noted Pingle was in a "severe depression," but had been out of her antidepressant for about three

weeks.  (Tr. 306.)  Pingle resumed her antidepressant and by August 2015, was doing well without any significant symptoms.  (Tr. 300.)  In October 2016, she again indicated she was "doing well without any significant affective symptoms."  (Tr. 525.)  On examination, she had a normal thought process and perception, with appropriate affect and demeanor.  (*Id.*)  Pingle again denied any significant affective symptoms to Dr. Houston in February and April 2017. (Tr. 513, 510.)

In conjunction with the medications prescribed by Dr. Houston, Pingle saw Dr. LaTurner for monthly counseling visits.  (Tr. 378.)  Pingle often presented as downcast, anxious, and depressed.  (Tr. 376, 375, 373.)  In October 2015, she was "stressed out" and frustrated.  (Tr. 373.)  In November 2015, she was tearful.  (Tr. 372.)  However, the ALJ noted that, in 2016, Pingle's medications were adjusted and her mood improved.  (Tr. 28.)  The ALJ observed Pingle continued to struggle with depression and had a tendency to socially isolate herself, but also had begun working and had a goal of being a certified chemical dependance assistant.  (*Id*.)  Pingle did not have any psychiatric hospitalizations or emergency room visits, and beyond one visit with Dr. Rhee, did not regularly see a psychiatrist.  These treatment notes establish Pingle does have some degree of mental limitation, which the ALJ acknowledged, but do not support a finding Pingle would off-task for 25% of the workday or miss more than four days of work per month.

Pingle asserts the "ALJ's accusation that Dr. Houston's treating source findings are inconsistent with Dr. LaTurner's opinions is simply factually incorrect."  (Doc. No. 15-1 at 11.) Pingle bases this argument on the fact both Dr. Houston and Dr. LaTurner found Pingle would miss work more than four times a month and be off task for 25% of the workday.  (*Id.*)

However, this is a misreading of the ALJ's decision.  The ALJ does not use Dr. Houston's opinion to discredit Dr. LaTurner's conclusions.  Rather, the ALJ uses Dr. Houston's actual treatment notes, which, as discussed *supra*, repeatedly note Pingle was "doing well without any significant affective symptoms."  (*See* Tr. 29, 525, 513, 510.)

Pingle also contends "the fact [she] is engaging in part-time work does not mean that she can sustain full-time work without any problem."  (Doc. No. 15-1 at 11.)  As noted *supra*, the ALJ discredited Dr. LaTurner's conclusions in part because Pingle "has managed to be successful with her current part time employment" and there "is no indication that she would be unable to do this sort of work, or other work with appropriate accommodations on a full time basis."  (Tr. 28.)  It was appropriate for the ALJ to consider Pingle's ability to work part-time when evaluating Dr. LaTurner's opinion.  *See* 20 CFR §404.1571 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did. We will consider all of the medical and vocational evidence in your file to decide whether or not you have the ability to engage in substantial gainful activity.").  *See also Miller v. Comm's of Soc. Sec.,* 524 Fed. App'x 191, 194 (6th Cir. Apr. 22, 2013)("Further, the ALJ did not err by considering Miller's ability to maintain part-time employment as one factor relevant to the determination of whether he was disabled.").  The ALJ was not concluding Pingle could work full time "without any problem," as Pingle suggests, as the ALJ did go on to provide fairly restrictive social and concentration limits in the RFC.

While Pingle cites to other evidence contained in the record which she believes supports Dr. LaTurner's findings, the conclusions of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."  *Buxton*

*v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001). Indeed, the Sixth Circuit has made clear an ALJ's decision "cannot be overturned if substantial evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). In this case, the ALJ clearly articulated good reasons for discrediting portions of Dr. LaTurner's opinion and these reasons are supported by substantial evidence.

Accordingly, the Court finds the ALJ properly considered Dr. LaTurner's July 2017 assessment. This portion of Pingle's first assignment of error, therefore, is without merit and does not provide a basis for remand.

**B.      Second Assignment of Error: RFC**

In her second assignment of error, Pingle asserts the RFC is not by substantial evidence because it does not account for (1) her need for a cane and (2) "a key limitation opined by the state agency reviewing physicians that could have been determinative of disability." (Doc. No. 15-1 at 16.) She asserts the "ALJ never directly addressed" her need for a cane and "the record evidence documents that an assistive device is medically necessary." (*Id*. at 16, 17.) Pingle also contends the state agency physicians' limit of "occasionally pushing and pulling bilaterally and occasional overhead reaching bilaterally" were omitted from the RFC by the ALJ "without any explanation." (*Id*. at 18.)

The Commissioner maintains the RFC was supported by substantial evidence. (Doc. No. 14 at 13.) She asserts the "ALJ properly excluded use of an assistive device such as a cane or walker from the RFC determination" because "it is not clear from the medical records [Pingle] required a cane for walking." (*Id*. at 13, 14.) The Commissioner contends the ALJ was also

40

"under no obligation to wholesale adopt any doctor's opinion when formulating the RFC." (*Id.* at 15.)  She insists "the fact that state agency reviewing physicians opined that Plaintiff could occasionally push and pull and occasionally reach overhead, does not dictate the RFC."  (*Id.*)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).[8]  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer v. Astrue*, 774 F.Supp.2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec*., 383 Fed.Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the

---

[8]     Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

41

adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

***Use of Cane***

Relevant to this case, Social Security Ruling 96–9p addresses the use of an assistive device in determining RFC and the vocational implications of such devices:

> **Medically required hand-held assistive device:** To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96–9p, 1996 WL 374185, *7 (S.S.A. July 2, 1996).

Here, the ALJ determined Pingle had the following residual functional capacity

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: can occasionally operate foot controls; occasionally climb ramps and stairs, never climb ladders, ropes and scaffolds; occasionally balance, kneel, crouch, stoop, and crawl; frequently reach.  Must avoid all exposure to unprotected heights and no commercial driving; Understand, remember, and carry out simple instructions; Perform simple, routine, and repetitive tasks but not at a production rate pace such as an assembly line; adapt to routine changes in the workplace that are infrequent and easily explained; interact occasionally with supervisors, coworkers, and the general public.

(Tr. 22.)

In the decision, the ALJ acknowledged Pingle's use of a cane.  (Tr. 23.)  The ALJ

42

"noted that [Pingle] left her cane in the car on the day of the hearing, and had no obvious difficulty with walking into the room." (*Id*.)  The ALJ observed that two weeks after her hip surgery, Pingle was using a cane "as needed." (Tr. 25.)  When discussing Dr. Houston's opinion, the ALJ noted Dr. Houston found Pingle required a cane, but "also stated that the claimant could walk up to 1/4 mile without a cane." (Tr. 26.)

The Court finds substantial evidence supports the ALJ's decision not to provide a limitation for a cane in the RFC.  During her December 2015 consultative examination, Pingle had normal muscle power and tone in all muscle groups and intact sensation in all extremities. (Tr. 401.)  She had a normal gait and did not require an assistive device for ambulation or transfer. (*Id*.)  She was able to squat, kneel, walk in tandem, and stand on her heels and toes. (*Id*.)  Dr. Houston did not observe the use of a cane in any of the treatment notes cited from 2015 or 2016. (Tr. 308, 306, 302, 300, 534, 530, 525.)  Prior to her hip surgery, her orthopedist treatment notes revealed an antalgic gait and a decreased hip range of motion, but did not document the use of a cane. (Tr. 585, 594, 611.)

While Pingle objects to the ALJ's brief discussion of her cane usage in the decision, this minimal discussion is consistent with the medical evidence.  The bulk of Pingle's medical records do not document a need for a cane.  Indeed, the first treatment note cited by either of the parties which reference a cane or assistive device was a May 2017 post-operative note, over two years after the alleged date of onset. (Tr. 656.)  While Pingle directs this Court's attention to several treatment notes which document an "antalgic gait," an antalgic gait does not correspond to the need for a cane. (*See* Doc. No. 15-1 at 17.)

Pingle points to the physical RFC assessment form filled out by Dr. Houston, which

indicated she required a cane.  (Doc. No. 15-1 at 17, Tr. 669.)  However, beyond checking the box indicating a cane was required, Dr. Houston provided minimal detail as to the circumstances under which Pingle required a cane.  (Tr. 669-670.)  The "mere notation by a physician that a claimant should use a cane is not evidence of medical necessity."  *Halama v. Comm'r of Soc. Sec.*, 2013 WL 4784966, *8 (N.D. Ohio Sept. 5, 2013).  Moreover, Dr. Houston found Pingle would be able to walk a quarter of a mile without any assistive device, indicating Pingle was able to ambulate for a considerable distance before requiring a cane.  (Tr. 670.)  Pingle argues this notation by Dr. Houston provides the "circumstances necessary" for Pingle's cane use, and therefore, the "assistive device was medically necessary."  (Doc. No. 15-1 at 17.)  However, the ALJ was not required to adopt the findings of Dr. Houston when formulating the RFC and his decision not to incorporate the use of a cane into the RFC is supported by substantial evidence.  *See also Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 Fed. App'x 395, 401 (6th Cir. Apr. 30, 2018)("We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ.").

Pingle asserts the ALJ should have "explained why the device was being omitted." (Doc. No. 15-1 at 17.)  However, reading the decision as a whole, it is clear the ALJ considered Pingle's purported need for a cane and rejected it.  The ALJ acknowledged Pingle's testimony she required one, but also noted Pingle did not present to her hearing with a cane "and had no obvious difficulty with walking into the room."  (Tr. 23.)  The ALJ also reviewed the medical evidence, observing Pingle could "tandem walk, stand on heels and toes, squat and kneel."  (Tr. 24.)  The ALJ observed Pingle was only using the cane "as needed" in the weeks following her

44

surgery.  (Tr. 25, 649.)  The ALJ was not required to provide a detailed discussion of Pingle's cane use, particularly given there was minimal evidence that she even used one.  Indeed, the burden is always upon a claimant to present evidence of her disability.  *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.").

Accordingly, the Court finds the ALJ properly considered Pingle's cane use and the decision not to incorporate this limitation in the RFC is supported by substantial evidence.  This portion of Pingle's second assignment of error, therefore, is without merit and does not provide a basis for remand.

### State agency restrictions

Pingle argues the ALJ omitted several upper extremity limitations from the state agency physicians' opinions, despite according these opinions "great weight."  (Doc. No. 15-1 at 18.) Pingle asserts the "ALJ had a duty to explain why certain limitations were overlooked due to the heavily[sic] reliance on those opinions."  (*Id.*)

The Commissioner asserts "there is no legal basis for arguing that affording these doctors' opinions great weight meant that the ALJ had to then accept all limitations opined by them."  (Doc. No. 14 at 15.)

In formulating the RFC, ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists."  20 C.F.R.§

404.1527(e)(2)(i)[9].  Nonetheless, because "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists," ALJs must consider their findings and opinions.  *Id*.  When doing so, an ALJ "will evaluate the findings using the relevant factors[10] in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions."  20 C.F.R. § 404.1527(e)(2)(ii).  Finally, an ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist" unless a treating physician's opinion has been accorded controlling weight.  *Id.*

As noted *supra*, the state agency physicians opined Pingle, among other things, could occasionally push and pull bilaterally and reach overhead with the upper extremities.  (Tr. 96, 97, 111-113.)  The ALJ did not include these restrictions in the RFC, instead limiting Pingle to light-level lifting and carrying restrictions, no climbing of ladders, ropes, or scaffolds, and frequent reaching.  (Tr. 22.)  In the decision, the ALJ weighed the state agency physicians'

---

[9]     Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

[10]    These factors include the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.  20 CFR §416.1527(c)(1)-(6).

opinions as follows:

> Great weight is accorded to the conclusions of the State agency medical and psychological consultants in finding the claimant capable of performing work related activities at a light exertional level, with appropriate accommodations regarding postural movements, as well as finding that the claimant's mental health related impairments resulted in a mild to moderate degree of limitations. (Exhibit 1A and 3A). The State agency consultants have specialized knowledge in assessing medical findings within the Social Security standard.

(Tr. 29.)

The Court finds the ALJ properly evaluated the opinions of the state agency physicians. The ALJ expressly acknowledged the state agency physicians' opinions, observing they opined Pingle was capable of light exertional work with postural movement limitations.  (Tr. 29.)  The ALJ accorded "great weight" to these opinions and provided a reason for doing so.  Specifically, the ALJ recognized the state agency physicians had "specialized knowledge in [the] assessment [of] medical findings within the Social Security standard."  (Tr. 29.)  Moreover, prior to weighing this opinion, the ALJ also discussed, at length, Pingle's long-standing shoulder problems.  (Tr. 23-25.)  The ALJ observed Pingle had tenderness and a decreased range of motion her shoulders, but "no signs of impingement or rotator cuff weakness."  (Tr. 24.)  The ALJ concluded that due to this restricted range of motion, "postural limitations as well as limitations regarding reaching" should be included in the RFC.  (*Id*.)  After this careful review, the ALJ provided a reason as to why he was affording the state agency opinions "great weight." (Tr. 29.)  Procedurally, the regulations require no more.

Moreover, a comparison of the RFC and the conclusions of the state agency physicians' opinions reveal they are generally consistent with each other.  Indeed, the ALJ limited Pingle to a light exertional level, with climbing, postural, and environmental restrictions.  (Tr. 22.)

47

Similarly, the state agency physicians limited Pingle to a light exertional level, with climbing, postural, and environmental restrictions.  (Tr. 95-97, 111-113.)  The ALJ deviated slightly from the state agency physicians' opinions by concluding Pingle could frequently reach, rather than occasionally reach, push, and pull.  (*See* Tr. 22, 95-97, 111-113.)  The ALJ also provided for more restrictive climbing limits, concluding Pingle could never climb ladders, ropes, and scaffolds, rather than occasionally.  (*Id.*)  However, the restrictions were, by in large, consistent with each other.  Thus, the ALJ's conclusion to afford the opinions "great weight" was appropriate.

Pingle contends because the ALJ assigned the state agency physicians' opinions "great weight," the ALJ was required to explain each deviation between the opinions and the RFC.  (*See* Doc. No. 15-1 at 18.)  The Court rejects this argument.  When an ALJ accords "great weight" to a medical opinion, the ALJ is not required to adopt every facet of the opinion expressed by the medical source.  *See Taylor v. Colvin*, 2013 WL 6162527 at *15 (N.D.Ohio Nov.22, 2013) (finding ALJ was not required to adopt every opinion of an ME "by virtue of the fact that, overall, he gave [the ME's] opinion great weight").  *See also White v. Comm'r of Soc. Sec.*, 2013 WL 4817673 at * 16 (N.D.Ohio Sept. 10, 2013) (noting that "[t]he fact that the ALJ did not incorporate all of Dr. Castor's restrictions, despite attributing significant weight to his opinion, is not legal error in and of itself"); *Smith v. Comm'r of Soc. Sec.*, 2013 WL 1150133 at * 11 (N.D. Ohio Mar. 19, 2013).  Thus, although the ALJ assigned "great weight" to these opinions, he was not required to include all of the limitations in the RFC or "explain why he did not adopt all of [the] limitations."  *Hedick v. Berrhill*, 2018 WL 6348759, *6 (N.D. Ohio Nov. 14, 2018), *report and recommendation adopted by* 2018 WL 6344611 (N.D. Ohio Dec. 4, 2018).

Moreover, the ALJ's RFC is supported by substantial evidence.  Pingle has a long history of right shoulder pain, which was precipitated by a remote workplace injury.  (Tr. 328, 320.)  However, on April 13, 2015, Pingle had 4/5 strength in her shoulder flexors and full strength in the remainder of her shoulder.  (Tr. 308.)  She had a full, active range of motion. (*Id*.)  In August 2015, she reported continued shoulder pain and Dr. Houston prescribed Lyrica. (Tr. 300.)  Thereafter, she continued to consistently report shoulder pain.  (Tr. 519, 510.) However, during her consultative examination, Pingle had normal muscle power and tone in all muscle groups and intact sensation in all extremities.  (Tr. 401.)  She had a normal gait and did not require an assistive device for ambulation or transfer.  (*Id*.)  She was able to grip and grasp with both hands.  (*Id*.)  She could reach forward, push, and pull with the upper extremities and could use her hands for fine coordination and manipulative tasks.  (Tr. 402.)  She had mild anterior shoulder tenderness bilaterally, but with negative impingement signs and no demonstrable rotator cuff weakness.  (*Id.*)  The consultative examiner limited her to work at the light exertional level based upon this evaluation.  (*Id*.)  This ALJ discussed much of this evidence and concluded "a light exertional level is supported by the objective record," with "additional postural limitations as well as limitations regarding reaching due to restriction in range of motion of the shoulders."  (Tr. 24.)

While Pingle argues the ALJ "omitted [these] key limitations without any explanation," she does not direct this Court's attention to what specific evidence would support these particular restrictions.  Indeed, she does not cite to any medical evidence, beyond the state agency opinions, which would support greater upper extremity limitations in the RFC.  (*See* Doc. No. 15-1 at 18-19.).  In this case, the ALJ clearly articulated his reasons for finding Pingle

49

capable of performing work as set forth in the RFC and these findings are supported by

substantial evidence.  Pingle's assertion the evidence of record warrants a different RFC

assessment because a state agency physician opined otherwise is without merit.

Accordingly, the Court finds the ALJ properly considered the opinions of the state

agency physicians and the upper extremity limitations in the RFC are supported by substantial

evidence.  This portion of Pingle's second assignment of error, therefore, is without merit and

does not provide a basis for remand.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's

final decision be AFFIRMED.

<u>s/Jonathan D. Greenberg</u>
Jonathan D. Greenberg
United States Magistrate Judge

Date: May 28, 2019

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of
Court within fourteen (14) days after the party objecting has been served with a copy of
this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within
the specified time may waive the right to appeal the District Court's order.  *See United
States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g
denied*, 474 U.S. 1111 (1986).**